UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE, et al.,<br><br>Defendants. | Civil Action No. 26-0825 (BAH) |

## JOINT STATUS REPORT

Pursuant to this Court's Minute Order dated May 26, 2026, the parties, by and through their respective undersigned counsel, respectfully submit this Joint Status Report.  As set forth herein, the parties have different positions regarding the status of this matter, which concerns requests by the Democratic National Committee ("DNC") for records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

### Statement of the Democratic National Committee

This case concerns eleven FOIA requests sent by the Democratic National Committee ("DNC") in October 2025 concerning potential deployment of federal agents and troops to polling places, drop boxes, and election offices.  Compl. ¶ 1 (ECF No. 1).  Forty-five days after this Court directed Defendants "to begin processing records potentially responsive to plaintiff's requests at a rate of 500 pages per month for each outstanding request, and to begin producing records to plaintiff each month thereafter on a rolling basis," May 28 Order, Defendants have not produced a single responsive record to the DNC.  Nearly nine months after the DNC sent its FOIA requests, *see* Compl. ¶¶ 28, 37, 46, 55, 67, 77, 88, 99, 112, 119, 128, four months to the day since the DNC began this litigation, *see* Compl., and nearly two months after this Court denied Defendants'

dilatory motion to strike, *see* May 20 Order, the essential purpose of FOIA remains unmet. *See, e.g.*, *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) ("The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.").

The DNC understood this Court's May 28 Order to require review and production of responsive records by the end of June. The Order contained three discrete directives: (1) complete searches by July 1, (2) begin processing records at a rate of 500 pages per month per request and begin producing each month on a rolling basis, and (3) file a status report by July 10. These commands matched the DNC's requested relief almost exactly, although the Court allowed for *processing* of 500 pages per month per request, rather than *production* of 500 pages per month per request. *Cf.* Jnt. Rep. 3 (ECF No. 20). Yet when the DNC asked Defendants on June 29 whether they intended to produce documents the next day, Defendants indicated that they had not yet even "considered how to account for the start" of the processing obligation. When the DNC raised the issue again on June 30, Defendants indicated that they read the order to require processing only after the completion of the search and to require production only in the month after processing. In other words, Defendants appear to read the May 28 Order to allow each agency to search until July 1, process 500 pages by August 1, and produce the first batch of responsive records by September 1, a mere two months and two days from Election Day.

Defendants' tortured reading cannot be squared with the plain text of the May 28 Order's distinct directives and its recognition of "the time-sensitive nature of the requests and the fact that the 'records are sought to inform an imminent public debate.'" May 28 Order (quoting *Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 411 F. Supp. 3d 5, 10 (D.D.C. 2019)). This Court issued an order "DIRECTING defendants to begin processing records," not to begin on some later date,

when all searches were complete.  Indeed, the Order earlier directed that "any remaining searches" be complete by July 1, making clear that some searches were already complete and some records were ready for processing.  The Court's subsequent requirement to begin producing records "each month thereafter" is best read to refer to the start of the following month—after processing—rather than the end of that month—after additional delay.

To resolve this disagreement between the Parties over the meaning of the May 28 Order, the DNC respectfully requests that this Court clarify the Order as follows:

A.  Processing obligations began immediately following the May 28 Order, not the completion of an agency's search, and repeat on a monthly basis thereafter.

B.  Production obligations immediately follow each monthly processing period and do not allow for an additional 30 days of review by "equity holders."  Defs.' ¶ 7, *infra*.[1]

To make up for Defendants' failure to process documents in June, the DNC also respectfully requests that this Court order Defendants to process 1,000 pages of records potentially responsive to each of the DNC's requests during the month of July, with processing to return to a 500-page cadence thereafter.  In light of the Parties' conflicting interpretations of this Court's May 28 Order, as well as Defendants' demand for formal process preceding any form of relief, *see* Defs.' ¶ 19, *infra*, the DNC would also welcome a brief status conference.

The DNC also wishes to bring a few agency-specific concerns to this Court's attention. With respect to DHS HQ, Defendants informed this Court on May 22 that "DHS HQ expects to

---

[1] Defendants suggest that such review is permissible under "basic features of the FOIA statute and FOIA practice, citing to 5 U.S.C. § 552(a)(6)(B)(iii)(III).  Defs.' ¶ 18, *infra*.  However, that subsection merely provides an explanation of "unusual circumstances" that may extend the statutory 20-day time limits for initial responses, which is no longer relevant.  *See* 5 U.S.C. § 552(a)(6)(B)(i).  In any case, such "unusual circumstances" must be "unusual," require written notice, require disclosure of the date of anticipated resolution, and must be resolved "with all practical speed."  *Id.* § 552(a)(6)(B)(i), (iii)(III).  They are not an open invitation to further delay.

make its first production by the end of June 2026." Jnt. Rep. 5.  No production has been made.

Indeed, DHS HQ now indicates that it has not even deduplicated its search results and will "process

any responsive, non-exempt records at a rate of 500 pages per request per month."  Defs.' ¶ 9,

*infra*.  DHS HQ makes no representation concerning anticipated production dates.  *See id*.  Even

if this Court were to decline to require one month of accelerated processing for all agencies,

accelerated processing is warranted with respect to DHS HQ.

With respect to ICE, the agency's prior representation that "its searches . . . did not locate

any responsive records," Jnt. Rep. 5, illustrates a remarkable lack of diligence.  Following receipt

of a no-records response, the DNC flagged repeated ICE deployments to polling places and

Secretary of Homeland Security Mullin's testimony on the subject.[2]  In turn, the DNC asked if

ICE would be willing to disclose the contours of its search immediately, rather than waiting until

summary judgment, to avoid any delayed dispute.  Only in response to that request did ICE search

the Office of the Chief Information Officer, the Executive Secretariat, Enforcement and Removal

Operations Headquarters, and the Office of Public Affairs, which uncovered 11,103 potentially

---

[2] In the last two months, ICE agents have conducted enforcement actions outside active polling places in Texas and California.  *See* Michael Karlis, *ICE Conducts Enforcement Action at San Antonio Voting Location, Witnesses Say*, San Antonio Current (May 20, 2026), https://www.sacurrent.com/news/san-antonio-news/ice-conducts-enforcement-action-at-san-antonio-voting-location-witnesses-say; Wes Woods II, *ICE Presence Outside Simi Valley Vote Center Raises Alarms*, Ventura County Star (June 3, 2026), https://www.vcstar.com/story/news/politics/elections/2026/06/02/ice-presence-outside-simi-valley-vote-center-raises-alarms/90378216007/.  Shockingly, ICE agents also entered an active polling place in New York to confront a poll worker over a months-old Instagram post addressing the killing of Renee Good.  *See* Patrick Whittle, *Election Worker Says Federal Officers Confronter Her at Polls Over Social Media Post Criticizing ICE*, AP (June 26, 2026), https://apnews.com/article/ice-poll-worker-syracuse-fa082f8ac25d019e93b526fdef37df6c;  *see also* U.S. Immigration and Customs Enforcement, *Firearms and Use of Force Handbook* 16 (2021) ("While performing law enforcement duties, Authorized Officers must carry ICE firearms unless operational circumstances preclude the carriage of firearms."), https://perma.cc/4ZMG-PP5S.

responsive pages. This will take more than 22 months to process at current rates. In light of the concerns raised by ICE's shift in position, as well as repeated ICE activity both outside and inside of polling places, the DNC respectfully requests that this Court order ICE to process at least 1,000 pages per month.

Taking the opposite tack, CBP has undertaken unfocused searches that have returned too many records to ever review. *See* Defs.' ¶ 10, *infra*. When CBP first raised the issue on June 26, the DNC suggested more effective search terms within 10 minutes. Days later, CBP informed the DNC that a variation on those terms had reduced the number of responsive records by more than 92%. The DNC then requested that CBP target searches to custodians with policy or operational planning responsibilities and conduct searches based on proximity limiters (after the DNC designed search strings to address CBP's technical limitations).[3] Therefore, the DNC respectfully requests that this Court order CBP to promptly conduct the requested searches using proximity limiters and—if the results remain unmanageable—to identify appropriate custodians and limit the search to records related to such officials.

### Statement of the Defendants

1.        Plaintiff's suit arises under the Freedom of Information Act ("FOIA") and relates to eleven FOIA requests submitted by Plaintiff to Defendants. After the parties submitted a Joint Status Report (ECF No. 20), this Court entered a Minute Order on May 26, 2026 directing

---

[3] Defendants claim that the DNC has "declined to narrow the chronological scope of the search, specify CBP offices or individual custodians of particular interest, or provide any leads indicating why they think responsive CBP records exist or where they might be held." Defs.' ¶ 10, *infra.* The DNC requested only records from January 20, 2025 until the processing date, *see* Compl. ¶ 67, and responded to CBP's query regarding why records might exist in less than 24 hours. The DNC also specifically requested that CBP target searches to custodians with policy or operational planning responsibilities and received no response. CBP suggests for the first time in this report that it is willing to target custodians likely to have responsive records, even if it is unwilling to identify them. The DNC will respond to counsel shortly with suggestions.

Defendants to "complete . . . any remaining searches for responsive records" by July 1, 2026; "begin processing records potentially responsive to plaintiff's requests at a rate of 500 pages per month for each outstanding request"; and "begin producing records to plaintiff each month thereafter on a rolling basis." The Court further directed the parties to submit a Joint Status Report by July 10, 2026 "advising the Court of the status of the matter, whether any disputes remain, and if so, proposing a schedule for further proceedings."

2.     Each Defendant has completed searches for records responsive to Plaintiff's request. As described more fully below, many Defendants' searches yielded no responsive records; in one of those cases, at Plaintiff's suggestion, a Defendant agreed to conduct supplemental searches and those supplemental searches are ongoing. One Defendant's search returned well over a million records, and discussions with Plaintiff are ongoing regarding potential ways to narrow those results. Each remaining Defendant that identified potentially responsive records is processing potentially responsive records at the rate of at least 500 pages per request per month. In the paragraphs that follow, Defendants provide a more detailed summary of the status of each request.

3.     **Department of Justice ("DOJ").** Plaintiff sent FOIA requests to four DOJ components, namely the Federal Bureau of Investigation ("FBI"), the Civil Rights Division ("CRT"), the Criminal Division ("CRM"), and the Office of Information Policy ("OIP").

4.     **FBI** completed its search and sent Plaintiff a no-records response on June 29, 2026.

5.     **CRT** collected approximately 49,525 potentially responsive records from an electronic search. CRT is processing those records at the rate of 500 pages per month and anticipates making its first production of any responsive, non-exempt records in August 2026.

6. **CRM** completed its search and sent Plaintiff a no-records response on April 21, 2026.

7. **OIP** has completed its initial search and has identified approximately fifty-five pages of records potentially responsive to Plaintiff's FOIA request. Additionally, the parties have conferred as to narrowing, and the parties have agreed to scope out portions of multi-subject documents not responsive to Plaintiff's FOIA request. OIP has completed an initial processing[4] of these fifty-five pages of potentially responsive records, and all fifty-five pages of potentially responsive records are presently pending on consultation with other DOJ components and Executive Branch agencies having equities in those records. OIP is actively working with those equity holders to finalize responses to outstanding consultations, and anticipates issuing responses on a rolling basis, as the consultation process is completed. OIP anticipates issuing a response on or before August 1, 2026.

8. **Department of Homeland Security ("DHS").** Plaintiff also sent FOIA requests to DHS Headquarters ("DHS HQ") and three DHS components, namely U.S. Customs and Border Protection ("CBP"), Federal Protective Service ("FPS"), and U.S. Immigration and Customs Enforcement ("ICE").

9. **DHS HQ** and **FPS** report that they have completed searches for potentially responsive records, which located 56 potentially responsive records consisting of approximately 2,180 pages. DHS Privacy is de-duplicating those records and conducting a responsiveness review for results provided by each component, and will process any responsive, non-exempt records at a rate of 500 pages per request per month.

---

[4] "Processing" includes further responsiveness review, manual de-duplication, application of the parties' scoping agreement, and application of FOIA exemptions as applicable.

10.    **CBP's** searches in response to Plaintiff's request returned approximately 1.6 million potentially responsive records.  Defendants conferred with Plaintiff on June 26, 2026, regarding the volume of potentially responsive records and agreed to consider proposals by Plaintiff to narrow the scope of the search.  On July 7, 2026, Defendants reported to Plaintiff that a narrowed search, conducted with parameters suggested by Plaintiff, returned some 116,779 records.  Although Defendants' view is that a request that returns that many records is "so broad as to impose an unreasonable burden upon the agency," *AFGE v. DOC*, 907 F.2d 203, 209 (D.C. Cir. 1990), Defendants have invited Plaintiff to submit further proposals to narrow the scope of the search.  Plaintiff submitted one such proposal on July 7, 2026, which CBP is currently reviewing.  Plaintiff, in its section of this report, objects that CBP conducted "unfocused searches that have returned too many records to ever review."  But Plaintiff's counsel has repeatedly declined to narrow the chronological scope of the search, specify CBP offices or individual custodians of particular interest, or provide any leads indicating why they think responsive CBP records exist or where they might be held.

11.    **ICE** completed its searches and on June 10, 2026, ICE sent Plaintiff a no-records response letter indicating ICE's Office of the Chief Information Officer ("OCIO") was tasked to search for records responsive to the FOIA request and no records were found.  Plaintiff subsequently communicated its view that responsive records likely exist; after the parties conferred, ICE agreed to task conduct supplemental searches to include the Executive Secretariat, Enforcement and Removal ("ERO") Headquarters, and the Office of Public Affairs ("OPA").  The supplemental search by OCIO found approximately 11,103 potentially responsive pages; those records will be processed at the rate of 500 pages per month, with a first production expected by August 7, 2026.  The supplemental search by ERO located no potentially responsive records.  The

supplemental search by the Executive Secretariat is ongoing and expected to conclude by July 31, 2026.  The supplemental search by OPA returned no records, but OPA suggested additional searches by Homeland Security Investigations and the Office of Policy, which are now underway.

12.      **Department of War ("DoW").**  Finally, Plaintiff sent FOIA requests to DoW's National Guard Bureau ("NGB"), U.S. Northern Command ("USNORTHCOM"), and the Office of the Secretary of War / Joint Staff ("OSW/JS").

13.      **NGB** completed its searches through the Army and Air National Guards and found no responsive documents.

14.      **USNORTHCOM** sent Plaintiff a no-records response on March 30, 2026.

15.      **OSW/JS** completed its searches, is processing potentially responsive records at the rate of 500 pages per month, and estimates that it will make its first production on July 31, 2026.

16.      **Response to Plaintiff's Arguments.**  Plaintiffs assert that Defendants are not in compliance with the Court's May 26, 2026, Minute Order and request extensive further relief. Plaintiff's claims are based on a mistaken interpretation of the Court's order, and their request for additional relief is both unfounded and improper.

17.      *First*, Plaintiff's accusations of non-compliance are based on a flawed interpretation of the Court's Minute Order.  That order required Defendants to "complete" searches by July 1, 2026, and to "begin processing records potentially responsive to plaintiff's requests at a rate of 500 pages per month for each outstanding request."  That order "must be understood in light of the circumstances surrounding its entry," *United States v. Philip Morris USA Inc.*, 682 F. Supp. 3d 32, 46 (D.D.C. 2023), and did not obligate a Defendant to process records in May or June if it did not collect potentially responsive records until July 1.  Similarly, the order's command that each Defendant process 500 pages per month and "begin producing records to plaintiff each month

thereafter" did not obligate a Defendant to produce records in June or July if no records had yet been processed and identified as responsive and non-exempt. Rather, the order required Defendants to make rolling, monthly productions of records once responsive, non-exempt records are identified, and indeed several agencies have provided anticipated dates of first production in July or August. Plaintiff's contrary interpretation of the order—which would in some cases require an agency to process and produce records before it has even collected them—is simply untenable.

18. As this discussion makes clear, Plaintiff (in its separate section, above) also mischaracterizes Defendants' interpretation of the May 26, 2026 Order. Lest there be any doubt, Defendants' position is simply that an agency that had not yet collected records because its search was underway was not obligated to process records before records were collected. Plaintiff appears to reject this premise, but does not explain why. Similarly, Plaintiff sometimes appears to reject without substantial explanation basic features of the FOIA statute and FOIA practice, including the idea that processing may result in further review by "equity holders." *But see* 5 U.S.C. § 552(a)(6)(B)(iii)(III) (permitting delay in production for "consultation" with other agencies or components "having a substantial interest in the determination of the request"). In other places, Plaintiff's claims are simply inaccurate, including (for example) Plaintiff's assertion that Defendants maintain that the order "allow[s] each agency to . . . produce the first batch of responsive records by September 1."

19. *Second*, Plaintiff uses its section of this joint report to request a series of further orders from this Court, including a 1,000-page-per-month per request processing rate for July, an elevated 1,000-page-per-month processing rate for ICE, and an order that CBP immediately conduct certain (unspecified) proximity searches that counsel are currently discussing. These requests for additional relief are both unfounded and improper. They are unfounded because each

agency and component is working diligently to respond to Plaintiff's requests as required by the existing order. They are improper because "[a] request for a court order must be made by motion," Fed. R. Civ. P. 7(b)(1), which affords the non-moving party notice and a meaningful opportunity to gather facts and legal authorities in opposition to the request, *see* L. Civ. R. 7(b), 65.1(c). As this Court observed not long ago, a FOIA plaintiff's request for relief of this nature, "compelling immediate action by the defendants," is a request for "a form of injunctive relief under Federal Rule of Civil Procedure 65." *Greenspan v. Exec. Off. for U.S. Att'ys*, Civ. A. No. 23-1816 (BAH), 2023 WL 12137661, at *2 (D.D.C. Nov. 21, 2023). Yet Plaintiff here makes no effort to comply with the relevant requirements or make the required showing. *See Winter v. NRDC*, 555 U.S. 7, 20 (2008). Plaintiff's requests should be denied for this additional reason.

20.    Defendants propose to submit a joint status report in sixty days, and every sixty days thereafter, until further order by the Court to apprise the Court of developments in this litigation.

Dated: July 10, 2026

/s/ Daniel J. Freeman
Daniel J. Freeman
(Bar No. 90038422)
Democratic National Committee
430 South Capitol Street SE
Washington, DC 20003
(202) 860-8000
freemand@dnc.org

Benjamin B. Klubes
(Bar No. 428852)
Adam Milller
(Bar No. 496339)
Klubes Law Group
1717 K Street NW, Suite 9000
Washington, DC 20006

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:    /s/ Andrew J. Vaden
ANDREW J. VADEN, D.C. Bar #1044860
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-2437

*Attorneys for the United States of America*

- 12 -

(202) 753-5054
bklubes@kblueslaw.com
amiller@klubeslaw.com

*Attorneys for the Democratic*
*National Committee*